Good morning, Your Honors. My name is Andrew Schwartz, and I'm here on behalf of the Cuperials and the Sycamores. I guess I begin by suggesting to the Court that although I'm the appellant, the burden still remains on my opponent to prove the validity of their motion for summary judgment that I think was erroneously granted by Judge Alsop. The law is quite clear, and the Supreme Court has stated over and over again that as a basic principle of Fourth Amendment law, that searches and seizures inside a home without a warrant are presumptively unreasonable. So what we have here is a search. Well, Judge Alsop, in his decision, he recognizes it. You know, he starts right off. This was a search without a warrant. Yes. And he says – and he goes on and he says we can only – it can only be justified if there was probable cause and exigent circumstances. And he goes through probable cause, and he says there was probable cause here for – I guess it was for an entry, not to search. For the search – he looked at probable cause, put that aside, and he said the critical question here is exigent. Exigent circumstances. Absolutely. And that's where we are. Yes, Your Honor, we are. And I – So why weren't there – is it your contention that there – that there's a genuine tribal issue of fact over the exigent circumstances? Absolutely. I – Why? I would say as a matter of law, there were no exigent circumstances. And if the Court feels that there may – that may not be the case, at the very least there is a tribal issue of fact as to whether or not there were exigent circumstances. I don't want to detour you too much from the substance of your argument. But did you make a motion for summary judgment on your side? We did not. I see. So it was – so we're only asked as to whether or not that summary judgment was wrongly granted. So we're not being asked to decide whether as a matter of law there were no exigent circumstances. No. Okay. That's correct. And I – I read your motion – your opposition in the – before Judge Alsop, and your position was – I understood it was that there were tribal issues of fact with respect to the exigencies. Absolutely. I merely stated in my argument that now that I'm here in this beautiful building that the fact of the matter is that there – as a matter of law, there were no exigent circumstances, but that not as the issue. Okay. There are two presumptions working in my favor right now, I would suggest. The first one is that search is presumed unreasonable. And oh, by the way, as to your comment about probable cause, Judge Alsop spent a great about how there was probable cause, and you, Your Honor, just brought up this morning. That was never an issue for us in this case. No, I understood that. There was always probable cause. He always – but he went by that and he zeroed in on exigency. Right. And, you know, the typical case of exigency, and there's all different degrees of it, but the typical case is where you see someone running into the house, or you hear a scream, or you're looking for a suspect, and you watch him go in, or someone says, he's in there, go get him. Oh, he's flushing the evidence down the toilet. Or flushing – you took the words right out of my mouth. Or flushing – there was none of that here. These – Or washing his clothes to get rid of the blood. Well, there isn't even any evidence that washing your clothes gets rid of blood, I might suggest. But there's no evidence that he was even in the house. None whatsoever. Well, they had – well, they knew from – I forget the names of all the people that are involved. Yes, there are a lot of people involved. I do, too. But the officers had some knowledge that he lived in the house. That was his residence. And the evidence before Judge Alsop and before this Court is that he wasn't always there, and he might be there from time to time. Well, if somebody lives there, that's pretty strong evidence that he will be there from time to time. Yes, but that – but it's not evidence that he's there now, and you have exigency. When the burden – as I was saying, there are two presumptions working in my favor. The first presumption is this is an unreasonable search and the burden's on them. And the second is the facts must be construed in the light most favorable to my side. And Judge Alsop seemed to say that the mere fact that he lived there and may have been there from time to time was evidence that he's there. Someone suggested to me once, Your Honors, that if they were looking at the house and they saw him inside, just standing there, would that in and of itself give them rise to exigency? And I submit not. Any time there's a crime, any time there's a known suspect, the police are always going to have the bare fear that that suspect is going to destroy something. So tell me what the material facts are that are in dispute over the exigent circumstances. I think that the material facts that are not necessarily in dispute, but the – No. But you argued to Judge – to Judge Alsop that there were factual disputes over the exigency. I want you to tell me what are the facts that a trier fact has to resolve in order to make that determination. Whether or not he was inside the house going to destroy evidence. That's certainly one of them. The Howell case that was cited by the – my opponents in this case talks about how the issue of exigency is one that can be submitted to the jury. They discuss in the Howell case that there is – there are the complicated issues that are of probable cause that can be submitted to the jury, as well as the legal issue of – I'm sorry, the complicated issue of exigency can also be submitted to the jury. Just because a cop thinks I've got to go do it now doesn't mean that it's necessarily okay. And that's allowed to be tested in court. But the evidence could be so de minimis on your side, for example, as to why there's a – why there's a triable issue of fact that the district court could be in a position to say, you know, what you've got is just so minimal that no reasonable trier fact could ever agree with you. And that's what I suggested should be the case here. But I didn't make the motion for summary judgment, as Judge Fletcher correctly pointed out. There is no evidence of exigency in this case. There was evidence that these police officers had a bare fear, and nothing else, that this person who may or may not have been in the house, they didn't know, was potentially going to do something that they didn't really know what it was going to be. Every time – as I mentioned to Judge – Excuse me. I'm sorry, Your Honor. They knew that he tried to wipe evidence off of his computer. That's not the state of the record. The other boy who gave the statement was the one who was wiping evidence off the computer. He wasn't a suspect in the murder case. He was a suspect in the hydroponics case. Oh, I might be mistaken, because I had the same impression that Judge Hall has or had, that there had been a statement of the police officer, that Scott had, in fact, tried to erase evidence from his computer. Is that correct? It's my understanding – You're getting nods over there. That was days before, right? I'm sorry. I had the record wrong, Your Honor, and I'm sorry. The point is, he tried to destroy evidence, and he might have more evidence in the house. They thought he was a flight risk. I mean, I think there were a number of things that they were concerned about. Whether that's enough of that is another question. They didn't know the – The only thing is, it gave them pause. Oh, absolutely. It gave them pause, and they were concerned. But I would submit to you, if you find exigent circumstances under these facts, you could find that any time that there is a crime. You're always worried about a criminal destroying evidence. You need to have specific, articulable facts. We saw him in there. We knew he was going to do this. They didn't even know that he was in the house. How can you rush into a house without a warrant? They're just totally dispensing with the warrant requirement. And that's just part of it. But I would agree with you, Your Honor, that the major issue in this case is the exigency. So they get into the house. Yes. And then you have claims about excessive force. Yes. And Judge Alsop said, as a matter of law, you just didn't show excessive force. It was just really – really, when you look at what happened here, it was really just de minimis. They put the point of the guns at their head just to stabilize the situation. Right. And that was it. That was not a big deal. Right. Well, I think that that's a factual – that is an issue for the jury to decide. They deny behaving a certain way. The plaintiffs claim they behaved a different way. That's not a significant part of this case. It's a part of this case. But I think that there's clearly factual disputes. The officers deny using the foul language that our clients say they did. The officers deny throwing Mr. Kirill to the ground the way he said he was thrown to the ground. The length of time the guns were pointed at the young children is in dispute. Judge Alsop found it was de minimis. I think that if the jury thinks it's de minimis, they can find that there's no excessive force. Now, Judge Alsop did one other thing to cover all bases here, which was he said, you know, even if there's a constitutional violation, these officers are entitled to qualified immunity. Understood. That's what he found. Why isn't that – what's wrong with that? Because this Fourth Amendment right to be free from searches and seizures in your house is clearly established. And just because someone has a bare fear – and I just can't emphasize that enough, Judge. There are no articulable facts. He was afraid that something bad was going to happen. And I don't want to resort to this argument, but I think it's important to know. This was a high-profile case. This was a big deal, and the police officers didn't – just were moving a little bit too fast, quite frankly. There is a warrant requirement that they needed to follow, and they didn't. The right to be secure in your home has been clearly established for decades. The right is very clear. It's obvious that you're right. The right has been clearly established. We know as a matter of established law that if you're going to do a warrantless search into the house, they need exigent circumstances. No question that that is clearly established law. But the question for qualified immunity is not whether that law, as it were in the abstract, is clearly established. The question is whether or not the officers were so wrong in concluding that there were exigent circumstances that they should be deprived of qualified immunity. So you've got to say not only were they wrong, they were really wrong, and they should have known they were really wrong. Absolutely. But in this – getting back to my initial example, the traditional situation of exigent circumstances, when you hear the scream in the house, when you know someone's going to be doing something specifically that you can articulate, they had this sort of generalized fear. Generalized fear, quite frankly, is not enough to excuse a constitutional violation. They need to be more specific than that. And that's what happened here. Okay. May I talk about one other thing? Oh, sure. The 13-hour detention. That was totally uncalled for. They had – the facts are that within a very short period of time that they arrived at the house, they knew the person they were looking for wasn't there. They had information. They knew at the time that there were young children in the house. People – they also knew that everybody else in the house wasn't suspected of a crime. Then they went ahead and arrested the person they were looking for within 30 minutes of their initial entry. Three-plus hours go by while they're in the house without a warrant, and they know the person they're looking for is in custody. How in the world do they have a right to be in the house at that time and detain those people? And then continue that detention for up to 13 hours. There's absolutely no justification for that. And our Supreme Court says, who isn't always favorable to the position that I take, that an initial entry into a home that might be reasonable can go bad. And to hold this family for 13 hours under these circumstances is quite – How about when they got the warrant? I'm sorry, Your Honor? How about when the police obtained the warrant at 1 o'clock at night? They had a right to be in the house. Was that given any greater authority to detain the folks there? Not necessarily. Were they carried out their search? These people had – there was no reason to detain these people. They weren't suspected of any criminal activity whatsoever. They were totally intimidated by what had just occurred. And at 1 o'clock, they had greater authority. They finally had the lawful authority to be in that home, but – And to be in that home and perform a search? After they had the warrant? Yes. Absolutely. And once they have lawful authority to be in the home and to perform a search, you're saying they can't – I assume that they have lawful authority not only to perform the search, but during whatever reasonable time is necessary for the search to put the occupant in a certain place where they will not interfere with the search. Absolutely. But the occupants had the right to leave the moment. Well, certainly, I think the occupants had the right to leave at any time. This is the middle of the night now. This is 1.30 at night. They're not going to – were the occupants saying, can I leave now? No. They were saying what they would have liked to do was maybe go to bed, but they didn't want to leave the house. The occupants would have loved to have left the house at 8.30 when the officers came in without the warrant. No, I understand that, but I'm now talking after the warrant had. Well, the damage had already been done at that point, certainly to the occupants. But I'm trying to sort out where your argument runs. I think you've got one argument as to the detention prior to the warrant. Yes. That is to say, they've come into the house without the warrant. Even if exigent circumstances justify the entry without the warrant, they know within a fairly short time that whatever exigent circumstances they might have suspected aren't there. That is to say, Scott is not there. They don't see anybody in here who's in the process of or is likely to destroy evidence justifying exigent circumstances. So that's one argument. Yes, it is. But the second argument is, okay, what about the detention after they have the warrant? And that's the argument I'm looking at at the moment. Yes. So once they have the warrant and, therefore, the lawful right to search, it seems to me that they have the right to make the occupants of the house stay in a place where they will not interfere with the search so long as this is a reasonable time for doing the searching. Do you disagree with that? I don't disagree with it, but you're leaving out one fact. Okay. They don't gain extra rights because they illegally detain them for the first five hours. I got that part, too. Okay. Why don't we hear from the other side? My light just went off. That's okay. We'll give you a chance to respond. Thank you. May it please the Court. I am Christine Hopkins from the law offices of John F. Martin, and I represent the appellees in this case, the County of Contra Costa, Sheriff Warren Rumpf, and the 18 individually named deputies in this case. Appellant's assessment of the law applicable to the undisputed facts of this case missed three critical factors, and let there be no doubt that these are undisputed facts about what information law enforcement had at the moment they determined that there were exigent circumstances. There is no dispute about what Robin and Tom Crone told Detective Pate. There is no dispute about what information Detective Pate got from his investigation of the crime scene and from Karen Schneider, whose credit card information was stolen. The three critical factors the appellants miss in this argument, first, is the gravity of the crime. The appellants miss the malicious break with normalcy that Scott Dulesky, a 16-year-old, exhibited when he bludgeoned his neighbor to death, stabbed a knife through her abdomen. Why did that create imminency? The gravity of the crime is one factor that the Supreme Court in Welsh v. Wisconsin and Illinois v. MacArthur said weighs into the totality of the circumstances. You look at the gravity of the crime. You look at the destructibility of the evidence. You look at whether that suspect is going to be a flight risk. The motivation of a homicide suspect to flee or destroy evidence is much greater than that of someone who has committed a lesser crime, let's say just credit card fraud. Can you focus on it? Just give me as carefully as you can, just tell me in ordinary talk, what were the exigent circumstances? What were they trying to prevent by entering now rather than waiting for the warrant? The warrant, which is going to come here pretty quick. So what exigency were they using or relying, legitimately relying on, that got them in now rather than a few hours later? They knew that in the four days since the homicide, the homicide suspect had already attempted to wipe his computer clean of evidence connecting his credit card fraud to the murder. They also knew that the adults in the household who resided with Scott Dulesky, Fred and Kim Curiel, had realized that Scott was unsuccessful in wiping his computer clean. Scott realized that. He knew that Fred and Kim Curiel were investigating him. Robin Crone quite clearly says... Scott knew what? He knew that he'd been unsuccessful in wiping it clean or he knew that the Curiels were investigating him? Both. He knew both. He knew both. How did the police know that he knew both? Because Robin Crone says Scott Dulesky came to him. Fred Curiel is looking at his computer. Fred Curiel has found out that he's committed the credit card fraud. Scott Dulesky is going to admit to the credit card fraud to Fred Curiel because Fred Curiel has found out about it. Robin Crone also says that... Does that tell us that Scott knows from that that he was unsuccessful in wiping clean from his computer? That is a logical inference to make from what Robin Crone told the detectives. Why is that the logical inference? Because if he had been successful in wiping his computer clean, Fred Curiel would not have been linking Scott Dulesky to that credit card fraud. Fred Curiel was a technological expert. He had skills that normal people don't have. And he was able to find a cache of electronic evidence in this computer after Scott Dulesky had wiped it clean. And he was investigating Scott's computer? He was investigating Scott's computer. Later, he broke down crying in front of Tom Crone, saying that there was a link between the credit card fraud and Pamela Vitale, the homicide victim's address. Fred Curiel had gone so far as to link the credit card fraud with the murder. Right. And do we know, did the police know that Scott had been told, Fred has gone into your computer after you thought you had wiped it clean and discovered from what's on the computer that there's a link? Were the police told that? What we definitively know is that Scott knew Fred was going to go look at Robin's computer. Scott thought that Fred was going to go look at his girlfriend's computer. And what Scott knew is that the adults in his life were so suspicious of him that they were continuing to investigate him. And I think we have to ask ourselves a critical... But that falls short of Scott knowing, or the police having a reason to know that Scott knew, that Fred had gone into Scott's computer and discovered the information despite Scott's attempt. Well, that's what Fred Curiel tells Tom Krohn, and that's what Tom Krohn tells Detective Page. Why do you say that? What do you mean by that? Fred Curiel says to Tom Krohn, Scott had tried to wipe his computer clean, but I'm a techie, I'm an expert, I went into Scott's computer and I found... I know that, but we may be at cross purposes. What I'm after is, you're telling us, as a reason for exigency, that Scott knows, or the police know, that Scott knows, that he has, in fact, been unsuccessful in wiping his computer clean. I'm trying to figure out how does... I think that's getting to... Let me ask, and then... You're doing fine, and you're anxious to answer me, but let me finish, and then we can be clear. So I'm trying to figure out whether the police really have some reason to believe that Scott knows or thinks that he has been unsuccessful. And so far, I haven't heard from you how the police know, or think they know, that Scott knows or thinks that he's been unsuccessful. Scott knows that he's in trouble, we know that much. Right. So let's say that Scott doesn't know that Fred Curiel went into his computer... Well, I didn't say let's say. I asked you how do we know that that's true. If you're saying, listen, we don't know, you can say... I'm saying because there's no other way for Fred Curiel to have known that Scott committed this credit card fraud according to what the police know. No, but now you're asking a different question. I understand that Fred knows this. Right. What I'm asking is, does Scott know that Fred has gone into his computer and discovered that Scott has been unsuccessful in wiping it clean? That's the question I have. I think that's the logical inference any reasonable law enforcement officer would know, knowing that Scott Dulesky is worried that now Fred is going to look at Robin's computer and his girlfriend's computer, and he knows Fred's a technological expert and he works in the computer field. I think that's the logical inference that Scott Dulesky is going to draw by the fact that Fred is going along this line of investigation. Okay, I won't belabor that one. So we're working on the exigent circumstances. Scott may worry that he has been unsuccessful in wiping his computer clean. And the second major point is Scott Dulesky starts to panic on Tuesday, October 18th, about the fact that he left his DNA on the murder victim. He starts coming up with stories about how the murder victim grabbed his wrists, and that's how his DNA is going to be found under his fingernails. So he's already making up a cockamamie story. Yeah, so law enforcement knows that Scott Dulesky is agitated, panicked. His mind has turned to this problem of DNA linking him to the murder scene, and he knows that there's an electronic connection on his computer from his credit card fraud to the murder scene. They also know that Scott Dulesky has already tried to destroy evidence. That is to say wipe the computer clean. Right, and that this is a grave crime, and that his next logical step is to be successful in destroying evidence that's going to link him to that murder. So what evidence is he going to destroy, or that the police think he's going to destroy, in the interval between the time they actually go in and the time they would have gone in had they obtained the warrant? Blood evidence that would have remained on his clothes. There is a declaration by Detective Pate and Detective Barnes that say that homicide suspects can use OxyClean, which is a product to destroy blood evidence of their crime. He could have burned the clothes. I don't know what OxyClean is. Is it something you can get in the supermarket? It is a substance that's readily available that a suspect could just pour on the clothing to compromise the DNA evidence. Readily available. Where? Like I've never heard of it. My mother has OxyClean in her laundry room. Billy Mays, whatever his name is, advertised on television? Perhaps something along those lines. So we can get it in the supermarket. Okay. So if he had had OxyClean, he could have taken the evidence of blood off his clothes in the interval between the time they came in and they would have gotten the warrant, okay? Correct. He could have gotten to his laptop, taken the hard drive out of his computer, and compromised the electronic evidence on that drive. And the other fear that the detectives had, looking at the totality of the circumstances, is here's Fred Curiel. He may be innocent, but he's accessing Scott Dulesky's computer. He's techie. He knows about computers. And he is able to find this electronic cache. And Fred Curiel, going around Scott Dulesky's computer, doing whatever he's doing to try to investigate this crime, could quite innocently compromise the electronic evidence on that computer. That's a double-edged sword. You just told us he's a techie, so he knows how to take care of stuff. And now you're saying, but they thought maybe he was going to screw it up by accident because he wasn't a techie. By accident or on purpose. Because here's the other thing that the law enforcement knew. They knew that Fred Curiel had evidence of Scott Dulesky's commission of the credit card fraud and this link to Pamela Vitale's, the murder suspect's, address. Fred Curiel does not call the police. He does not turn over the computer to the police. He goes to see a lawyer, and there is not one call to the police department, from Fred Curiel, Kim Curiel, anyone in that house, to report the evidence they know they have of a crime that was committed against their neighbors, no less. So a reasonable law enforcement offer is saying, you know, what are these Curiels doing here? They're investigating Scott. They're not coming forward with the information they have. Scott's panicking. You know, this is the house where all this evidence is most likely to be because our canines have tracked a scent from the murder scene through the Lafayette woods, so they know that the murderer left the house on foot, and Scott Dulesky talks to Robin Crone about having taken a walk in the woods, in the mist, in the Lafayette woods. I couldn't tell from what I read. Did the dogs tracking, it turns out they've been tracking Scott. I know that they tracked him for a while and then they lost him, but what I couldn't tell is, was he walking in the direction of his house? The scent was lost in the direction that someone would have gone down that hill to get to his house eventually, but the scent was lost, and it was lost a number of yards away from the house. It was 350 yards away from the house that the scent was lost. The murder house or Scott's house? To Scott's house from the murder scene. The dogs track the scent, and they lose it. Right, they lose it. And you're saying it was 300 and some yards away from the house when they lost it, away from the murder house? No, away from the point the canines lost the scent. So the canines lose the scent. Which house are you measuring at 300 yards? Where the dogs lose their scent, to Scott's house. To Scott's house. To Scott's house, through the woods. Now, I couldn't tell from what I read that that was so, because it just didn't specify. But you're telling me if I look in the record, they'll say that when they lost the scent, they were within 300-plus yards of Scott's house? That's in Detective Pate's testimony in the Skelton hearing before Judge Colon. Okay, good. But a critical question here, you know, the appellants point to the fact that Scott Dulesky didn't know law enforcement was on his trail. But here we have to ask ourselves this critical hypothetical question. Is a 16-year-old, let's say he's a drug dealer, is he any less likely to flush his narcotics down the toilet because his parents, rather than law enforcement, have found out what he's doing and have become suspicious of his wrongdoing? Here, Kim and Fred Curiel were investigating Scott, and Scott knew that there was evidence on his computer linking him to the murder suspect's address. Well, I'm not sure he does. He knew there was, which is why he tried to wipe it clean. But I'm not yet convinced that he knows that he was unsuccessful. And I think that the logical inference that a reasonable detective would draw in Detective Pate's circumstances, after hearing everything that he heard from Robin and Tom about Fred's behavior during these four days, about Scott's behavior during these four days, that's the logical inference that Detective Pate, as a homicide detective with a lot of years' experience, can draw. Okay. And I'm not sure he has to have absolute ñ I'm not sure the police have to have absolute knowledge. They may just have a reasonable suspicion that he may know that he was involved but, in fact, he was unsuccessful. Okay. And, you know, the fact that they knew his state of mind, they knew he was panicking, this was a first-hand report. This is not the narcotics case in which we infer, because a courier hasn't returned, that the narcotics dealer is going to get agitated and might think that law enforcement is investigating and might be panicking and might be thinking about destroying evidence. This is a case where we know from Robin Crone that Scott Zaleski is panicking. He is agitated. We know that he has already tried to destroy evidence. We know about his state of mind. If I can summarize, I think so far all of the exigency argument goes toward possible destruction of evidence. Correct. Is there any other part of the exigency argument than possible destruction of evidence? And flight, because he's worried that his DNA is on this. So they're worried that he might be in the house and he might flee. Correct, because that's another important part about the excessive force, too. Okay. But they're surrounding the house. Why isn't that sufficient to protect against his fleeing the house? Because as soon as they approach the house, they see two persons running from the front of the house to the back of the house. They know. That's neither here nor there. If they have the house surrounded and they think Scott may be in there, which they do think. Now, they can't be sure he's in there, but I think they've got a reasonable ground to think that he might be. If they have the house surrounded, and they've got lots of guys there. I forget how many. Eight, was it? A whole bunch of them. Why isn't it enough to have the house surrounded to prevent his flight? Because as soon as they know that someone in the house has recognized law enforcement process that ups the ante for Scott Gillespie to either destroy the evidence right then and there, immediately before them. I'm not talking about that now.  Flight gives him the opportunity to arm himself, to grab a knife, to grab the rifle that the law enforcement think his dad has stored in the attic, and to make this a dangerous standoff situation. Those five young children in the house, their safety was best protected by law enforcement exercising immediate command over the inside of that house, preventing Scott from grabbing a weapon, from creating a dangerous either standoff situation, hostage situation. I got it. Okay, but that's not. I now understand that argument. That's not flight. But you're arguing that if he knew they were out there, and maybe they would have had trouble concealing themselves, and that's a little unclear to me how hard it was for them both to surveil and to conceal, that he might have created a dangerous situation. But that's a little bit different from flight. That's creating a dangerous situation. Okay, I got it. Correct. Once, you know, their goal in going to secure that house was to prevent the destruction of evidence in flight, and then once they know that he's in there, well, once they think that somebody's recognized that they're there, they have to prevent a dangerous situation from escalating. It's 830 at night. But the running within the house is produced by them starting to break in. So long as they're out on the perimeter standing there, there's no evidence at all that anybody's running within the house. So that running within the house is produced by their motions. I put that off to one side. They've already made up their mind they're going in at the time they see that running. At the time they see the running, they make up their minds that they have to go in. That's correct. No. At least as I read the record, they are on their way in when they see the running. Is that wrong? The appellant's position is that there was no knock and announce notice, but that the sheriff's department saw the person's running before they even got to the door to knock or announce. So that's the appellant's position. Listen to me carefully. I think that they have evidence, and for purposes of summary judgment we need to take it as true, that the running in the house is prompted by the police starting the process of actually entering. Am I right that they have evidence that that is so? That's not the way that I look at the record. The way that I look at the record is... Are you saying that they have no evidence that that's so? No, because nobody in the house hears a knock on the door or a bang on the door. They say there's no knock notice. So how can there be an entry? A lot of people say they have. Some people say they didn't. Some people say they did. There seems to be a real factual dispute over whether or not there was a knock. And the way Judge Alsop resolved that was to resolve it in the appellant's favor and say that there was no knock notice and that we're assuming the facts that there is no knock notice and then what they did wasn't constitutional. And he says yes, because there were individuals running in that house. But Scott Dulesky created the exigency for them to be there on the perimeter of that house in the first place by having this panicked state of mind that law enforcement knew about by already trying to destroy the evidence. I think I got it. So exigency is possible destruction of evidence, possible flight, and possible creation of a dangerous situation if all they do is kind of stay around the perimeter and wait for the warrant. Correct. Okay. Correct. Thank you. And I'm not sure if I still have any time remaining. No. Okay. Thank you very much. That's the centerpiece of the case. Okay. I think the Court articulated it correctly. Possible flight, possible destruction of evidence. But just mere possibilities. There needs to be more to find exigency. And at the very least, the jury should get to decide whether that's exigency or not. I mean, I understand that this may very well be a legal issue under certain circumstances, but the Ninth Circuit has also held that the issue of exigency should be decided by the jury. Justice Fletcher articulated three different things, all predicated by the word possible, because something could possibly happen. Does that give the police the right to do away with the warrant requirement? Finally, as to the issue of qualified immunity, this entry into the home was led by Mahoney. Mahoney had no knowledge of any of this. He just made the decision on his own to go into the house. And one final point, changing the facts somewhat, if Mahoney was standing in front of that house with the young man who gave the statement, and the young man gave the statement and said, I think Scott might be in there, would he have been justified going in that house right then and there just to go see if he could arrest Scott and freeze the house? I would submit not. It doesn't do away with the warrant requirement. If you think that there's ‑‑ if you're going to rely on exigency, you need to be able to articulate the facts, and the articulable facts really aren't here in this case. Okay. Thank you. I thank both sides for your helpful argument. Curiel v. Contra Costa County submitted for decision. That concludes argument for this morning, and we are now in adjournment. Thank you. All rise.
judges: Hall, Fletcher W. , Paez